Walter J. THOMAS, et al., Plaintiffs,

v.

Warren CHRISTOPHER, Secretary
of State, Defendant.

Civil Action No. 86–2850 (SS).

United States District Court,
District of Columbia.

Nov. 7, 1996.

Charles Lindsay Warren, Warren Eugene Connelly, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, Barbara Bethone Hutchinson, New Carrollton, MD, Carl E. Anderson, Walter & Haverfield, Cleveland, OH, for Walter J. Thomas.

Charles Lindsay Warren, Warren Eugene Connelly, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, Carl E. Anderson, Walter & Haverfield, Cleveland, OH, for Bernard Johns, Tushinde Cooper.

Charles Lindsay Warren, Warren Eugene Connelly, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, Joseph Marc Sellers, Washington Lawyers' Committee for Civil Rights, Washington, DC, Carl E. Anderson, Walter & Haverfield, Cleveland, OH, for Susan E. Alexander, Isaiah M. Aldridge, Lawrence Atcherson, Herman O. Bailey, Johney Brooks, E. Lloyd Davis, Odie Fields, Cassie Ghee, Constance E. Huggins, Eric James, Lisa Layne, Maurice McLeggan, Laurance Stanley, Vandoster Tabb, Judith D. Tonohou, Aubrey Verdun, Charlotte Williams, Joszet H. Ziegler.

Charles Lindsay Warren, Warren Eugene Connelly, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, Barbara Bethone Hutchinson, New Carrollton, MD, Joseph Marc Sellers, Washington Lawyers' Committee for Civil Rights, Washington, DC, Carl E. Anderson, Walter & Haverfield, Cleveland, OH, for Alan B.C. Latimer.

Charles Lindsay Warren, Warren Eugene Connelly, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, Theresa Grace Lawhorn Watson, Law Offices of Eva P. Britt, Washington, DC, Joseph Marc Sellers, Washington Lawyers' Committee for Civil Rights, Washington, DC, Carl E. Anderson, Walter & Haverfield, Cleveland, OH, for Alphonso G. Marquis, Ward D. Morrow, Alfred Neal, Raymond G. Robinson, Mary Cynthia Smoot, Melvin T. Spence, Robert Watkins, Dorothy Watkins.

John Oliver Birch, Cynthia Ann Schnedar, U.S. Attorney's Office, Washington, DC, for Warren Christopher.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court for consideration of a Consent Decree entered into by the parties. Plaintiffs' case was originally brought in October of 1986, so it has taken ten years to reach this proposed settlement. The Court attributes this delay to the complexity of the action and the settlement discussions, as well as to the untimely death of the judge to whom this case was originally assigned.

The Consent Decree seeks to resolve all claims that were or could have been brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–16 *et seq.*, by any African–Americans who were "Foreign Service Generalist Officers" or "Foreign Service Generalist Officer" career candidates at any time between January 20, 1984 and March 22, 1996, the date of Preliminary Approval of the Consent Decree.

The Court held preliminary fairness hearings on the proposed Consent Decree on March 18, 1996 and March 21, 1996. The Court held additional hearings on July 15, 1996, July 22, 1996, July 23, 1996 and September 19, 1996. During those hearings, the Court heard sworn testimony from members of the putative class who both supported and opposed the consent decree. The Court also heard argument on various matters related to the Consent Decree by counsel for the parties.

Members of the Plaintiff class testifying at those hearings have identified several issues that were of concern to the Court in its evaluation of the proposed Consent Decree. The Court has corresponded with the Secretary of State in an effort to address some of those concerns, and the correspondence is a part of the record. Several of these issues have subsequently been addressed by the Department of State and the Court hopes that several other concerns will yet be addressed by the Department. One issue, that of possible "opting out" of the class of present and former FSOs by those who desire to do so, will be resolved by the Court's decision here.

The Court has reviewed the parties' Proposed Joint Findings of Fact and Conclusions of Law and adopts them as its own with certain minor modifications. The Court's Findings of Fact and Conclusions of Law follow.

## FINDINGS OF FACT

### Background

In June 1984, Walter J. Thomas, an African–American former Foreign Service Officer ("FSO"), filed an administrative EEO class complaint on behalf of himself and other African–American FSOs, alleging discrimination regarding post and duty assignments, performance appraisals, promotions, censuring, and selection out. In May 1986, Bernard Johns, who is also an African–American former FSO, filed an individual administrative complaint alleging racial discrimination for failure to promote him from grade FO–02 to grade FO–01 and for not receiving an assignment for which he had bid.

Following denial of Mr. Thomas' class complaint by the agency, on October 17, 1986, Walter J. Thomas and Bernard Johns filed their original complaint in this action. The complaint alleged that the Department of State engaged in discriminatory employment practices and retaliatory behavior in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* Specifically, the complaint asserted that: (1) the State Department discriminated against black FSOs in assignments, performance appraisals, promotions, tenure, and selection out and (2) that the Department had retaliated against black FSOs for objecting to these unlawful employment practices.

The State Department denied each of Plaintiffs' allegations, contending that: (1) the Department had complied with the letter and spirit of Title VII, and (2) the Plaintiffs did not satisfy the requirements for class certification. Plaintiffs filed their first motion to certify the lawsuit as a class action on January 15, 1987, prior to taking any discovery. They sought certification of a class of all black Foreign Service Officers and career candidates employed by the Department of State at any time after January 20, 1984.

Plaintiffs' motion for class certification was denied by Judge Revercomb on July 20, 1987.

On April 28, 1988, Judge Revercomb denied reconsideration of the motion to certify a class action, but granted Plaintiffs' motion to file an amended complaint thereby allowing 30 additional individuals to intervene in order to assert claims of discriminatory employment practices and retaliatory behavior against the Department similar to those asserted by Plaintiffs Thomas and Johns. Following several status conferences, the Court indicated it would consider a renewed motion to certify the class.

Between 1988 and 1994, class counsel obtained in discovery more than 60,000 documents, and hundreds of answers to interrogatories, and they took more than 60 hours of depositions of State Department witnesses regarding the employment practices at issue. In addition, class counsel retained Economic Research Services, Inc. ("ERS"), a Tallahassee, Florida, based economic consulting firm which has considerable experience in employment discrimination cases, to perform statistical and other studies on a "stipulated" computerized database of information provided by the State Department in discovery. This database consists of 93 separate computer tapes and over 1000 pages of explanatory memoranda, printouts, and other documents. Working at class counsel's direction from 1988 through 1995, ERS performed numerous alternative analyses of more than one million individual personnel transactions recorded on the database occurring from 1981 through 1994, pertaining to over 6000 FSOs of all races. The primary objective of these analyses was to determine whether statistically significant evidence of racial discrimination against African–American FSOs existed in any State Department employment practices covered by the complaint.

The State Department retained Longbranch Research Associates to create the stipulated data base and to analyze data with respect to Plaintiffs' allegations in this case.

On December 6, 1991, shortly after the enactment of the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071–1100, the

Plaintiffs moved the Court for leave to file a Second Amended Complaint to demonstrate that their claims against the Department were based on a disparate impact as well as a disparate treatment theory of liability and to request a jury trial, compensatory damages, prejudgment interest, and expert fees, which were not available to Plaintiffs prior to the enactment of the Civil Rights Act of 1991.

By order dated June 2, 1993, the Court established December 1, 1993 as the date for filing a renewed motion for class certification. At the parties' request, on September 21, 1993, the Court suspended discovery and the previously established litigation schedule in order to permit the parties to pursue settlement negotiations. After the deadline for completing those negotiations was twice extended, and in the absence of an imminent settlement, on February 14, 1994, the Court directed counsel for the Plaintiffs to file their renewed motion to certify a class by June 15, 1994.

On June 2, 1994, Plaintiffs withdrew their Second Amended Complaint, on which the Court had not yet ruled, and moved the Court for leave to file a Third Amended Complaint which renewed the claims in the Second Amended Complaint, designated four additional class representatives, and updated certain factual representations. On June 8, 1994, the Court granted Plaintiffs' motion.

Plaintiffs filed their Motion for Class Certification on June 15, 1994, and the State Department filed its opposition to Plaintiffs' motion on September 14, 1994. Both parties supported their filings with detailed affidavits from their statistical experts. However, as a result of the progress reported by the parties in settlement discussions which continued, at the Court's request, under the supervision of Magistrate Judge Alan Kay, the class certification hearing was scheduled and postponed several times. During negotiations, the parties met with Magistrate Judge Kay on more than 15 occasions.

In February 1995, counsel for the class and the Department reached an agreement in principle to settle the case. Various Plaintiffs opposed some of the elements of this agreement. Negotiations between the parties continued in order to finalize the details.

On January 31, 1996, counsel for the plaintiff class agreed to recommend a settlement to the approximately 360 class members. The terms of the settlement are embodied in a Consent Decree, which was signed by counsel for the parties on January 31, 1996, and then submitted to the Court for its approval.

■ To determine whether the proposed Consent Decree was fair, reasonable, and adequate, the Court followed the two-step procedure suggested in the *Manual for Complex Litigation* § 30.44, at 241–42 (2d ed. 1985). First, the Court held a Preliminary Hearing on March 20, 1996. This was: (1) to determine whether the proposed agreement was within the range of an acceptable settlement justifying final approval and, if so, (2) to arrange for providing notice to the members of the class and affording them a hearing to determine whether final court approval should be granted. At the Preliminary Hearing, the Court heard extensive presentations from counsel for the parties, counsel for individual class members, and, separately, from 13 class members. The Court granted preliminary approval on March 22, 1996.

The second stage of the settlement approval process involved sending the proposed Consent Decree to every known member of the class together with a court-approved notice informing all class members of their right to file comments, objections, and any statement of interest in opting out of the settlement. Class counsel, counsel for the defendant, and counsel for some of the individual Plaintiffs all reviewed the notice prior to its approval by the Court. This notice also informed all class members of their opportunity to appear and be heard at a Fairness Hearing on July 15, 1996. The Court's March 22, 1996 order and the Fairness Hearing Notice stated that class members' responses to the Notice and comments on the Consent Decree must be received by the Court on or before June 11, 1996.

With respect to the Fairness Hearing on July 15, 1996, the court-approved notice was sent during the first week of April 1996 to all known class members as follows:

(a) To class members in the Foreign Service assigned to State Department posi-

tions in the United States and to class members separated from the Foreign Service but employed by the State Department in a Civil Service or contractor position, the required documents were delivered by State Department internal mail. The documents delivered through the State Department's internal mail included an "Acknowledgment of Receipt" form and a pre-addressed envelope to use to return the confirmation form.

(b) To class members in the Foreign Service assigned to non-State Department positions in the United States and to class members who are separated from the Foreign Service but who do not work for the State Department in another capacity and whose last known address is in the United States, delivery was via U.S. registered or certified mail, return receipt requested.

(c) To class members in the Foreign Service assigned to U.S. Government facilities overseas, delivery was via U.S. Department of State pouch.

Of 359 known class members who were sent notice, approximately 30 notices were either returned or delivery was not acknowledged. No class member indicated any deficiencies in nature or timeliness of the notice provided to them. Nor did any class members complain of lack of opportunity to present to the Court their views in opposition to or in favor of the settlement.

In addition, in accordance with Section 108 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2, all FSOs and career candidates employed by the State Department as of March 22, 1996, the date of Preliminary Approval, were provided notice that one or more of the terms of the settlement might adversely affect their interests and legal rights and to advise them of the opportunity to file objections or comments and to appear at the July 15, 1996 Fairness Hearing. Accordingly, the Court finds that the conditions of Section 108 of the Civil Rights Act of 1991 were satisfied and that the terms of the Consent Decree may not be challenged hereafter by anyone who either had actual notice of the settlement or whose interests were adequately represented by another person who presented objections at the Fairness Hearing.

The notice of the July 15, 1996 hearing was reasonably calculated, under all of the circumstances, to apprise interested parties of the proposed settlement and afford them an opportunity to comment on the terms of the Consent Decree. *See, e.g., Weinberger v. Kendrick,* 698 F.2d 61, 70–71 (2d Cir.1982) (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *see also, Grunin v. International House of Pancakes,* 513 F.2d 114, 120 (8th Cir.1975) ("the mechanics of the notice process are left to the discretion of the court subject to the broad 'reasonableness' standards imposed by due process"), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). The Consent Decree and Fairness Hearing Notice delivered to class members and other individuals reasonably conveyed the information that was required to be communicated and afforded a reasonable time for those interested to comment on the proposed settlement. The objectors had adequate and reasonable opportunity to formulate and present meaningful objections to the proposed settlement. In all, nearly 11 weeks were available for the preparation and filing of objections between Preliminary Approval of the proposed settlement on March 22, 1996, and the deadline for filing objections on June 11, 1996.

Based on the foregoing, and all other evidence before the Court, the Court finds that pursuant to the requirements of Rule 23 and due process, proper notice of the proposed class certification and terms of the settlement was given to class members.

**Relief to the Plaintiff Class in the Settlement**

The Court finds that the settlement provides fair, reasonable and adequate relief to the class, as follows:

### 1. *Prospective and Injunctive Relief*

The Consent Decree provides that an injunction will be entered, effective for four years from the date of this Court's Preliminary Approval, prohibiting the State Depart-

ment from discriminating on the basis of race in promotions, awards, censuring, terminations, performance evaluations, selection out, post and duty assignments, conal assignments, or training. The injunction also bars the State Department from retaliating against any class member for participation in equal employment opportunity activities.

The Consent Decree requires the following significant internal State Department reforms:

*Council for Equality.* The Consent Decree provides for a senior level Council for Equality in the Workplace to monitor and advance equal employment opportunities in the Department. The Council will consist of eight high-ranking members of the Department selected by the Secretary of State, including at least one African–American, and will be chaired by the Under Secretary of State for Management. In response to a suggestion from the Court, the Secretary of State agreed to appoint one additional Council member from outside the State Department and to meet personally on an annual basis with this Council. The Council will review annually data on the racial profile of post and duty assignments and honor award recipients within each Bureau and across the Department, including the profiles of Ambassadorial positions, Assistant Secretary and Deputy Assistant Secretary positions, and all other "program direction" positions. Following its review of the data, reports from Assistant Secretaries and Bureau heads, the Council will meet with Assistant Secretaries and bureau heads to make policy recommendations concerning employment practices that advance the goals of equal employment opportunity in the Foreign Service. Class counsel may submit reports to the Council regarding barriers to advancement or imbalances in opportunity in the Foreign Service on the basis of race which they or members of the class believe exist at the State Department. The Council will also provide class counsel with copies of its annual reports.

*Job Analysis/EER Revision.* The State Department, with the assistance of an expert consultant, will hire a contractor to conduct a comprehensive job analysis of FSO job duties, including an assessment of the knowledge, skills and abilities needed by FSOs. The expert consultant will then recommend whether the current Employee Evaluation Report ("EER") form used to evaluate FSOs should be modified to ensure that the potential of tenured FSOs is assessed on the basis of the knowledge, skills, and abilities necessary to perform successfully at the next higher grade and that racial bias is minimized in that assessment. Class counsel will play an active role, particularly in such areas as selecting the expert consultant, reviewing the draft Statement of Work for the contract solicitation, participating on a committee to advise the contractor, and reviewing the results of the job analysis and the underlying data. Performance appraisals determine who is promoted and who is selected out. These steps are designed to assure that the Foreign Service evaluation system relies on objective criteria to predict future success and to address the other concerns that motivated the class action.

*EEO/Diversity Awareness Training.* The State Department will revise and expand its EEO/Diversity Awareness training and require priority participation by all supervisors of FSOs and, eventually, by all FSOs. The revised training courses draw on successful programs used by other agencies and by private industry. They teach management methods that foster equality in the workplace and avoid discrimination in evaluations, assignments, and awards. The value of this provision lies in its potential to continue to change attitudes and behavior in the Department long after the Decree itself has expired. Plaintiffs' counsel already have reviewed a draft agenda for each course, including a description of all activities and the goal of each activity.

*Superior Honor Awards.* The Director General appointed a working group to review individual Superior Honor Award Nominations to determine whether these awards reflect the racial composition of the bureaus in the Department and, if not, to examine the circumstances under which the imbalances occurred, and to make rec-

ommendations to redress any particular or systemic problems that are identified. The purpose is to prevent future racial imbalance in the selection process, unless the working group finds legitimate (i.e., performance-based) reasons for the imbalance. Class counsel, after receipt of the raw data provided to the working group, may submit their own recommendations to the working group. Class counsel will also be offered the opportunity to review the report of the working group and to make such suggestions as counsel believe are warranted.

*Certification of Selection Out Process.* When a Performance Standards Board ("PSB") is considering an African–American FSO generalist for possible selection out, the Department will make its best efforts to include at least one African-American member on the Board. The Department will notify class counsel of its efforts in each instance in which an African–American member is not included on such a PSB. In addition, the Department will certify that the PSB received a briefing on EEO and made its decision on the factors identified in applicable precepts.

*Electronic Database.* The Department will establish an Integrated Personnel Management System ("IPMS"). The IPMS will permit the Department to collect and analyze data pertaining to personnel functions including but not limited to promotions, awards, censuring, and terminations by race.

*Affirmative Action Plan.* The Department will maintain and revise the current EEOC-approved affirmative action plan applicable to members of the Foreign Service.

*Monitoring.* The Consent Decree provides a mechanism for class counsel to monitor the Department's compliance with the consent decree. For a total of four years, commencing on the date the Court gave Preliminary Approval to the Consent Decree, the Department shall report the following information, covering the preceding twelve months, to class counsel: total FSO generalist population statistics; program direction, stretch, and training as-

signments; tenure decisions; honor awards; diversity training; promotions; and selections out. The Consent Decree also provides a mechanism for the parties to resolve disputes concerning application of or compliance with the consent decree. All reports will be filed with the Court, to enable it, as appropriate, to engage in an independent assessment of the implementation of the Consent Decree.

At the Fairness Hearing, Plaintiffs' expert on prospective relief gave his opinion that, after participating in extensive discussions with the State Department and consultations with class members, he had come to believe that the Consent Decree embodies significant reform measures designed to eliminate the barriers to advancement by class members. He also gave his expert opinion that the monitoring and accountability systems in the Decree were "state-of-the art."

### 2. *Retroactive Relief*

Sixteen class members will receive immediate promotions within the mid-level grades, and one class member will be promoted in the Senior Foreign Service from grade FE–OC to FE–MC. To maximize the remedial long-term effect on discrimination in the Department's personnel system, the seventeen promotions will be awarded to class members currently active in the Foreign Service who have been at their present grade for the longest period of time and who were recommended but not reached for promotion from that grade.

The Consent Decree provides for the selection of an impartial review panel (the "Review Panel") to make reinstatement decisions and decisions concerning termination damages. The panel consists of three members, one chosen by the 30 original named Plaintiffs, one chosen by class counsel, and the third chosen by the first two members. The Panel member chosen by the Plaintiffs through a nomination and voting process is a social anthropologist, an educator, and a former country director in the Peace Corps. Class counsel chose an attorney who served as counsel to the Deputy Attorney General, exercising oversight responsibility for issues affecting civil and political rights, and who

previously worked in the Civil Rights Division of the Justice Department. Those two Panel members selected as the third panelist a former FSO who served as Ambassador to Malawi and Uganda and as Consul General in Capetown. Following their selection, and subsequent to an interview with the Court, Panel members received court appointments. Their work and decisions, cloaked in quasi-judicial immunity, were discharged in exemplary fashion.

The Panel completed its work successfully and, on July 11, 1996, submitted to the Court its Decisions and Recommendations.

The Department will provide reinstatement with new five year limited term appointments as Junior Officer Candidates to four class members who did not obtain tenure while they served as Foreign Service Officer career candidates. The four reinstatements were offered to individuals selected by the Review Panel from a negotiated list of eligible class members according to the criteria set forth in the Consent Decree. The factors for selection included: (1) evidence that the class member was recommended for tenure by a Foreign Service Commissioning and Tenure Board but did not receive career status for other reasons, e.g. failure to clear language probation; (2) evidence of the percentage of recommendations for tenure based on the number of performance evaluations that are officially part of the class member's performance file; and, (3) evidence of the time the class member spent in the Foreign Service before being separated. A list of class members eligible for reinstatement is contained in a Confidential Exhibit to the Consent Decree.

The agreement provides for the class to receive a total award of $3.8 million in satisfaction of all class claims for monetary relief. $125,000 will be distributed to the 30 named Plaintiffs (or their estates) in recognition of their efforts to resolve the class action successfully, including $40,000 to Walter J. Thomas, the lead plaintiff,[1] and $85,000 pro rata among the 29 other named Plaintiffs.

$2.9 million will be distributed to class members who did not receive promotions or whose promotions were delayed. That money will be distributed according to a formula based on the amount of promotion delay experienced by each class member beyond the median time calculated by Plaintiffs' expert for white male FSOs.

A total of $775,000 has been divided into two pools for distribution to class members who may have been "selected out," i.e., terminated, for race-related reasons. Pool A (at least $200,000) will be allocated on a formula basis to 29 class members who were terminated from the Foreign Service on the grounds of "unsatisfactory performance" or who were considered constructively discharged according to the impartial Review Panel established by the terms of the Consent Decree and approved by the Court. Pool B ($575,000) will be distributed to four members of Pool A based on a number of specified criteria applied by the Review Panel as described in Appendix F of the Consent Decree. Pool B is available to a maximum of four class members in Pool A because that is a reasonable estimate of the number of excess terminations shown by statistical analysis. The monetary award to any individual from Pool B is capped at $250,000.

During the first week in June 1996, class members were notified of the preliminary calculations of the amount of their individual "promotion damages" awards. Under the terms of the Consent Decree, 265 class members would receive an average award for promotion damages of $10,900. Class members who did not qualify for this type of award include those who were promoted at or faster than white males, the comparison group used for damages calculations or those who were excluded under the damage distribution provision of the Consent Decree (Exhibit F) because they achieved the personal rank of Career Minister or Career Ambassador, or because they served as Chief of Mission regardless of personal rank. Seventeen class members who upon final approval of the Consent Decree will receive immediate pro-

---

1. Mr. Thomas has elected to opt out of the settlement, so he will not receive this or any other sum from the settlement.

motions to the next highest grade were also notified of their promotions in early June 1996.

The Review Panel also reviewed the applications of eight class members who applied for reinstatement and, as provided for in the Consent Decree, selected four. The Panel also analyzed the applications of thirty class members who applied for "termination damages" awards from "Pool A" and "Pool B." The Panel selected twenty-nine class members, who will receive an average Pool A award of $16,400. The Panel then selected four class members for Pool B and awarded them an average of $75,000. The Pool B awards ranged from $40,000 to $120,000. All Pool A and Pool B recipients were notified of their awards in early June.

Ninety-one of 359 class members, as well as two non-class members, filed comments regarding the Consent Decree. Thirty-four class members submitted comments in support of final approval of the Consent Decree and fifty-five class members objected to various provisions. Class members filed objections claiming inadequate individual and/or class-wide relief, inadequate injunctive and/or prospective relief, and inadequate monitoring provisions. Several class members did not identify their objections. Two non-class members filed objections asserting that the relief provided by the Consent Decree constitutes reverse discrimination.

At the July 15, 1996 Fairness Hearing, the Court heard from all class members who appeared and chose to testify. Of the 14 who spoke, 3 testified in favor of the settlement, 8 were opposed, and 3 were ambivalent or neutral. Two groups of objecting Plaintiffs retained separate counsel to present their objections. The Fairness Hearing continued on July 22 and on July 23 to permit counsel to respond to the Court's questions about the Consent Decree. At the close of the July 23 hearing, the Court directed the State Department to send a second notice to the twenty-seven class members who had indicated through testimony at the Fairness Hearing or in written comments their preliminary interest in "opting out." The notice required those twenty-seven to file a motion to opt out, to explain the reasons for their request, and to provide the legal authority which supported their request. The notice required those class members to respond by September 3, 1996.

Nineteen class members filed motions with the Court seeking to opt out of the settlement (three class members subsequently withdrew their motions and have been reinstated in the settlement). The Consent Decree itself does not expressly permit or prohibit opting out. The State Department maintains that the Court does not have the legal authority to permit "opt outs" under the circumstances of this case because the class sought certification under Rule 23(b)(2). Counsel for the 16 class members who seek permission to opt out contended that the Court has the discretion to permit opt outs. The Court addresses this issue below.

### 3. *Legal Fees*

██ The settlement provides for the distribution of $2.1 million in legal fees and expenses as set forth in Exhibit K to the Consent Decree. Defendant's counsel stated at the July 15, 1996 Fairness Hearing that the sum of $2.1 million was offered separately from the $3.8 million offer to settle the monetary claims of the class. The sum of $2.1 million includes reimbursement for expenses in excess of $650,000 actually incurred by the firms listed in Exhibit K of the Consent Decree. The balance of approximately $1.4 million represents compensation for the time spent by counsel and persons working at their direction.

The Washington Lawyers' Committee for Civil Rights & Urban Affairs, the law firms of Akin, Gump, Strauss, Hauer & Feld, L.L.P. and Walter & Haverfield devoted more than 30,000 hours to litigating and negotiating the settlement of this case. This reimbursement is considerably less than the rate provided under the guidelines established by *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C.Cir.1984), which applies to the determination of legal fees in Title VII cases in the District of Columbia circuit.

### Additional Findings

In addition to those findings of fact included above, the Court further finds as follows:

—Upon consideration of the number and extent of negotiating sessions, the close involvement of Magistrate Judge Alan Kay, and the compromises reached on the specific settlement terms, the Court finds that the Consent Decree was the product of arm's length bargaining and that there was no evidence of collusion;

—Based upon the report of the Review Panel and testimony from the Review Panel at the Fairness Hearing, the Court finds that the Review Panel reached its decisions according to the guidelines and procedures set forth in the Consent Decree and that its decisions were fair and reasonable;

—The reform measures undertaken by the State Department together with the four year injunction against discrimination and the provisions enabling class counsel to monitor the State Department's progress in implementing the terms of the Consent Decree are fair, adequate and reasonable prospective relief measures; and

—The award of $2.1 million in legal fees and expenses is reasonable and justified in light of the duration of this case, the relief obtained for the class, and the fact that the amount of legal fees and expenses represents a compromise that is appropriate under the facts and circumstances of this settlement.

## CONCLUSIONS OF LAW

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended, prohibits discrimination in employment on the basis of race. Specifically, Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ..." 42 U.S.C. § 2000e–2(a)(1).

Title VII also makes it unlawful for an employer to "limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise ad-versely affect his status as an employee...." 42 U.S.C. § 2000e–2(a)(2).

### Certification Of The Settlement Class

The parties have agreed that the Court, by approving the Consent Decree, shall be certifying a class of all African–Americans who are or were State Department Foreign Service Generalist Officers or Foreign Service Generalist Officer career candidates at any time between January 20, 1984 and March 22, 1996, the date of Preliminary Approval of the Consent Decree.

The practice of certifying a settlement class simultaneously with the approval of the pre-certification settlement is widely accepted. *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 157 (S.D.Ohio 1992) ("tentative settlement can precede or be concurrent with class certification" (quoting *Clark Equipment Co. v. International Union, Allied Indus. Workers of America*, 803 F.2d 878, 881 (6th Cir. 1986))); *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1422, 1424 (E.D.N.Y.1989); *In re Beef Industry Antitrust Litig.*, 607 F.2d 167, 173–78 (5th Cir. 1979), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981); *see also* Herbert Newberg & Alba Conte, *Newberg on Class Actions* §§ 11.22, 11.27 (3d ed. 1992).

By granting the requested certification, the parties will be able to avoid protracted litigation and effectuate a settlement that will provide immediate and substantial benefits to the members of the class. Moreover, given the lengthy, active, arms length negotiations between the parties and the fairness of the settlement, there is no danger of abuse of the settlement class device in this case.

Federal Rule of Civil Procedure 23(a) explicitly sets forth four prerequisites to class certification: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims of the class representatives are typical of the claims of the class; and, (4) the class representatives will fairly and adequately protect the interests of the class. In addition to meeting the requirements of Rule 23(a), the proposed class must also satisfy one of the three subsections of Rule 23(b).

The Court concludes that the class does meet the requirements of Rule 23(a) as follows:

■ *Numerosity* (Rule 23(a)(1)). This provision focuses on the practicality of joining all prospective class members in a single lawsuit. Where joinder is impractical, a suit may be maintained as a class action in the interest of judicial economy and to ensure access to the judicial system. *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980). Although Rule 23 requires no minimum number of class members, numerosity is generally satisfied by a proposed class of at least 40 members. *Committee of Blind Vendors v. District of Columbia*, 695 F.Supp. 1234, 1242 (D.D.C.1988) (63 class members satisfy numerosity requirement); *Sperling v. Donovan*, 104 F.R.D. 4, 7 (D.D.C.1984) (46 class members).

■ In this case, the known class consists of approximately 360 members, which includes more than 260 individuals actively employed by the State Department throughout the world. The Court concludes that the sheer number and wide dispersion of members of the proposed class renders joinder practically impossible. ·

■ *Commonality* (Rule 23(a)(2)). The requirement that a class action present common questions of law and fact is intended to ensure that every member of the proposed class has been subject to the same discriminatory employment practices. *General Tel. Co. v. Falcon*, 457 U.S. 147, 159 n. 15, 102 S.Ct. 2364, 2371 n. 15, 72 L.Ed.2d 740 (1982). Commonality requires proof that the treatment challenged as discriminatory was a "standard operating procedure—the regular rather than the unusual practice ... statistical evidence, for example, may suffice if the disparities in treatment are significant." *Wagner v. Taylor*, 836 F.2d 578, 592 (D.C.Cir.1987) However, it is not necessary that each class member have suffered from the policy in precisely the same manner, only that the alleged discrimination stem from that same general policy. *See, e.g., Rossini v. Ogilvy & Mather, Inc.* 798 F.2d 590, 597–98 (2d Cir.1986).

To demonstrate that the claims of each class member involve common questions of law and fact, the plaintiff class introduced evidence to support their contention that statistically significant disparities existed in the rates at which white officers and black officers are tenured, terminated, assigned, and promoted. The Plaintiffs also asserted that the existence of common questions of law and fact was established because the State Department's key personnel procedures are centrally administered, highly subjective, and applicable to all class members throughout their careers.

· To support their assertion, Plaintiffs argue that a successful Foreign Service career depends on performance evaluations, which represent a supervisor's subjective assessment of performance. Plaintiffs assert that the evaluation procedures which applied during time periods relevant to this case did not provide objective standards to ensure that impermissible considerations, such as race, did not play a role in performance appraisals. Further, Plaintiffs argue that because promotions depend entirely on the comparative rankings determined by selection boards, one officer might have been promoted over another whose performance was indistinguishable from the first officer's but identified as merely "outstanding" rather than "superlative" by that rating officer. Plaintiffs claim that the existence of common questions of law and fact was further demonstrated by the participation of 30 individuals as Plaintiffs in this lawsuits. The affidavits each filed with the First and Third Amended Complaints attest to how the State Department's policies affected his or her career and illustrated that the claims asserted are common to the class.

The State Department presented analyses disputing the existence of statistically significant disparities based on race and opposed Plaintiffs' contention of the existence of common questions of law and fact by noting that the Department's personnel system is highly decentralized.

Upon consideration of the entire record in this case, however, the Court finds that this case presents common questions of law and

fact and satisfies the requirement of Rule 23(a)(2).

■ *Typicality* (Rule 23(a)(3)). The typicality requirement is to ensure that the class representatives have suffered injuries in the same general fashion as absent class members. *Wagner v. Taylor*, 836 F.2d 578, 591 (D.C.Cir.1987). Because the elements of commonality and typicality tend to merge, *Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. at 2370 n. 13, where Plaintiffs establish commonality by proving class-wide harm caused by a subjective, centrally administered personnel system, typicality is satisfied by the same showing. *Id.* at 159 n. 15, 102 S.Ct. at 2371 n. 15. As with the requirement of commonality, the facts and claims of each class member do not have to be identical to support a finding of typicality. *Wagner*, 836 F.2d at 591.

■ In this case, to demonstrate that the class representatives' claims are typical of the class claims, the Plaintiffs assert that class representatives Thomas, Williams, Fields and Marquis all experienced discrimination in assignments, having been assigned to less desirable posts than other career-enhancing positions for which they qualified and bid. Plaintiffs Latimer, Marquis, Williams, and Fields claimed discrimination in tenuring, having experienced irregularities or delays in the tenuring process or having been terminated from the State Department for failure to obtain tenure. All of the class representatives claimed promotion discrimination, having been delayed or denied promotions they deserved. Finally, Plaintiffs Thomas, Williams, and Fields claimed they were terminated from the State Department for alleged poor performance or failure to receive tenure as a result of their performance.

The State Department contends that the class representatives did not present claims typical of the class because no single class representative suffered from all of the employment practices being challenged in the case and because the plaintiff intervenors, given the diversity of their individual allegations, did not meet the minimum criteria under the law for the creation of sub-classes.

Upon consideration of the entire record in this case, however, the Court finds that the experiences of the class representatives are typical of the allegations in the class complaint and satisfy the requirements of Rule 23(a)(3).

■ *Adequacy of Representation* (Rule 23(a)(4)). The adequacy of representation requirement is to ensure that the rights of absent class members are represented vigorously by qualified counsel and by the class representatives. *National Assoc. for Mental Health v. Califano*, 717 F.2d 1451, 1458 (D.C.Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984). The Court finds that class counsel have the experience and competence to provide adequate representation to all class members. The Washington Lawyers' Committee has extensive experience including the litigation of more than twenty class actions such as *Kernan v. Holiday Universal, Inc.* No. JH–90–971, 1990 WL 289505 (D.Md.1990); *McKenzie v. Kennickell*, No. 73–0974, 1986 WL 32653 (D.D.C. 1986) (Parker, J.); *Berger v. Iron Workers Local 201*, No. 75–1743, 1985 WL 56631 (D.D.C.1985) (Penn, J.); and *Cook v. Billington*, No. 82–0400 (D.D.C.) (Johnson, J.). Akin, Gump, Strauss, Hauer & Feld, L.L.P. is an international law firm with extensive experience in complex federal litigation, including individual and class EEO cases. Carl Anderson of Walter & Haverfield is the former legal counsel to the Governor of Ohio and has experience in a variety of civil rights issues.

In the present action, the predominantly equitable claims of the class arose from a system of personnel actions that have been uniformly imposed on all class members. Moreover, all the class representatives share the same commitment to assure that racial discrimination does not occur at the State Department and have vigorously prosecuted the claims raised in this lawsuit, even though in the context of settlement some of the class representatives may have differed with class counsel and with the class over the amount and distribution of damages. Ultimately, the adequacy of the named Plaintiffs' representation is determined by the terms of the settlement itself. *In re Corrugated Container An-*

*titrust Litig.,* 643 F.2d 195, 212 (5th Cir. 1981); 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions* §§ 11.28, at 11–59 (3d ed.1992) ("in the settlement context … the adequate representation requirement is satisfied when the court determines that the settlement was negotiated at arm's length and was not collusive in favoring the class representative").

■ The Court concludes that the settlement was clearly negotiated at arm's length and presents no danger of collusion. The following factors support this finding: (1) the size and complexity of the Consent Decree and the compromises reflected therein; (2) the context in which it was reached, that is, after more than nine years of litigation; (3) the fact that the settlement is the result of more than 30 months of often difficult negotiations between the parties; (3) the fact that during negotiations class counsel met with class representatives and other class members on more than 125 occasions and held more than 1000 teleconferences regarding various aspects of the settlement; the Court's personal knowledge of the negotiators; and the intervention of Magistrate Judge Kay in the final and other stages of the negotiations. Thus, the Court finds that class counsel and the class representatives fairly and adequately protected the interests of the class.

■ In addition to meeting the prerequisites of Rule 23(a), the class must be properly categorized under Rule 23(b). In this case, Plaintiffs moved for certification under Rule 23(b)(2), which authorizes class certification if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The Advisory Committee Notes to Rule 23 recognize that subdivision (b)(2) was intended for civil rights cases such as this one where "final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate." Rules Advisory Committee Notes to 1966 Amendments to Rule 23. The parties also submit that certification under Rule 23(b)(2)

is not limited to actions requesting only injunctive or declaratory relief, but may include cases that also seek monetary damages. *Probe v. State Teachers' Retirement System,* 780 F.2d 776, 780 (9th Cir.1986); *Women's Committee for Equal Employment Opportunity v. National Broadcasting Co.,* 71 F.R.D. 666, 671 (S.D.N.Y.1976).

The relief sought by the class, and secured by the terms of the Consent Decree, includes extensive injunctive and systemic relief in addition to monetary damages. The parties submit that, in cases where monetary relief is sought, certification under Rule 23(b)(2) is precluded only if the final relief sought relates "exclusively or predominantly to money damages." Rules Advisory Committee Notes to 1966 Amendments to Rule 23. Accordingly, the Court finds that the class in this case meets the requirements for certification under Rule 23(b)(2).

### The Consent Decree and the Interests Of The Class

■ The Court has concluded that the approval of the Consent Decree is in the best interests of the class.

■ Federal Rule of Civil Procedure 23(e) imposes a duty on the Court to review all class action settlements in order to determine whether approval is warranted. Rule 23(e) provides in relevant part that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." The requirements of Rule 23(e) are to "ensure that class actions are not settled or compromised to the undue detriment of others, normally absent class members who will be affected by the terms of the compromise." *Brooks v. State Bd. of Elections,* 848 F.Supp. 1548, 1552 (S.D.Ga.1994); *Officers for Justice v. Civil Serv. Com'n of City and County of San Francisco,* 688 F.2d 615, 624 (9th Cir.1882) (Rule 23(e) protects "class members, including the named Plaintiffs, whose rights may not have been given due regard by the negotiating parties"), *cert. denied,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983); *Simer v. Rios,* 661 F.2d 655, 665 (7th Cir.1981)

("requiring notice to putative class members ... insures that [their] interests will be protected"), cert. denied, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982).

■ In approving a proposed settlement agreement, the district court must determine that the agreement is "not the product of fraud or overreaching by, or collusion between, the negotiating parties and that the settlement, taken as a whole is fair, reasonable and adequate to all concerned." *Williams v. Vukovich,* 720 F.2d 909 (6th Cir.1983); *Leverso v. SouthTrust Bank of Ala., Nat. Assoc.,* 18 F.3d 1527, 1530 (11th Cir.1994); *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1291 (9th Cir.), cert. denied, 506 U.S. 953, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992); *Luevano v. Campbell,* 93 F.R.D. 68, 86–91 (D.D.C.1981).

The Court concludes that the settlement reached in this case is the product of extensive, non-collusive negotiations between the parties conducted through the most critical stages by Magistrate Judge Kay. There is no evidence of fraud or duress, as demonstrated by a number of factors, including the length and complexity of the Consent Decree, the compromises reflected therein, and the fact that the settlement occurred only after years of extensive discovery.

The Court's determination is guided by a variety of factors including: (1) the strength of Plaintiffs' case on the merits balanced against the amount offered in settlement; (2) the opinion of counsel on the fairness of the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the length, complexity, and expense of further litigation; (5) the reaction of class members to the proposed settlement and their opposition, if any, to the settlement terms. *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1375 (9th Cir.), cert. denied, —— U.S. ——, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1993); *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1323–24 (2d Cir.1990); *Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 118 (3d Cir.1990); *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.), cert. denied, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982); *League of Martin v. City of Milwaukee,* 588 F.Supp. 1004 (E.D.Wis. 1984).

■ Although the relative importance of any single factor depends on the circumstances of each case, balancing the strength of the plaintiff's case against the terms of the settlement is generally regarded as the most important. *Van Horn v. Trickey,* 840 F.2d 604, 607 (8th Cir.1988); *Parker v. Anderson,* 667 F.2d at 1209; *Flinn v. FMC Corp.,* 528 F.2d 1169 (4th Cir.1975), cert. denied, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974) ("[I]f the settlement offer was grossly inadequate ... it can be inadequate only in light of the strength of the case presented by the Plaintiffs.").

The settlement provides broad prospective relief which the Plaintiffs could otherwise secure only by prevailing at trial on all issues. Under a realistic projection of potential litigation outcomes, it is unlikely that the class, if certified, would prevail on all issues. Thus, a more narrowly tailored injunction would be entered, and it is unlikely that class counsel would be able to monitor the impact of the reform measures on class members on which they did not prevail at trial. Although several prospective reform components in the Consent Decree also have been implemented pursuant to the settlement of the women's class action, *Palmer v. Christopher,* class counsel's ability to monitor those provisions is essential and can only be guaranteed through this settlement. The Court therefore determines that the certainty of prospective relief secured by the settlement, when compared to the uncertain outcome of litigation, is in the best interests of the class.

Prospective relief measures are as follows:

■ *Promotions.* The class will receive 17 immediate, new promotions. Plaintiffs' counsel presented arguments during settlement negotiations that demonstrated a maximum shortfall in the promotion of African-Americans in the range of 40–47. That analysis aggregated data across the mid-level grades and for all years covered by the lawsuit and counted as a promotion "event" the failure of a class member to be actually promoted from one grade to the next. Plain-

tiffs' counsel and experts had no statistically significant evidence of promotion discrimination in the junior grades or the senior grades of the Foreign Service. In the senior grades there were too few class members to make statistical analysis meaningful.

The State Department disputes Plaintiffs' aggregation analysis and contends that, after controlling for appropriate variables, its maximum exposure was 10 "promotion events." According to the Department's statistical experts, a promotion event was a calendar year and, to the extent a shortfall existed, was properly remedied through monetary damages rather than actual promotion to the next grade. The Department asserts that Plaintiffs' analysis counted the same officer multiple times because promotion boards met annually and often promoted an officer upon subsequent review. Further, the Department contends that the shortfall of 10 applied only from grade 03 to grade 02, the only grade where a statistically significant shortfall even arguably existed.

In settlement, counsel for the parties agreed to 16 actual promotions for mid-level grade class members and one promotion within the Senior Foreign Service from grade OC to grade MC based upon analysis of the litigation risk that, if defendant's statistical model was found persuasive and Plaintiffs' model was rejected, Plaintiffs would obtain few, if any, actual promotions.

The Court determines the agreement to promote 17 class members to the next highest grade according to the procedures outlined in the Consent Decree to be fair, adequate, and reasonable.

 *Terminations/Reinstatements.*
Four class members who were separated for failure to achieve tenure will be reinstated into the Foreign Service as a result of the settlement. During negotiations, the parties disagreed over the accuracy of portions of the stipulated database pertaining to tenure and terminations of FSOs previously granted tenure. Class counsel argued that all performance based terminations should be aggregated for analytical purposes, including career candidates denied tenure and officers separated for alleged poor performance.

The State Department contends that separate analysis was required for tenure decisions and performance-based terminations of those officers who had previously received tenure. The State Department initially maintained that, after analyzing all post–1984 tenure decisions, there was no statistically significant disparity in the tenure rates of African–American career candidates. The Department reached the same conclusion for the performance-based separation of tenured officers. In addition, the Department asserted that an insufficient number of class members were denied tenure or separated for poor performance to certify a class on either issue, whether separated or combined for analysis. Accordingly, the Department refused to offer any reinstatements.

In light of the litigation risks presented by the parties' conflicting views on the correct data, the proper statistical methodology for analysis, and the likelihood of certifying this issue, the parties agreed to the reinstatement of 4 class members who failed to achieve tenure for limited five year appointments as Junior Officer Candidates, with the opportunity to obtain tenure.

The Court concludes that, because of the litigation risks, the agreement to reinstate 4 class members at the junior level according to the procedures outlined in the Consent Decree is fair, adequate and reasonable. Nonetheless, as the Court has mentioned on several occasions during the course of these deliberations and as it expressed in a letter to the Secretary of State, it would also be fair and appropriate for the Department to establish voluntarily some process for looking at the 15 or so individuals who now seek reinstatement but who were denied it because of the arbitrary limits of the settlement agreement. In the letter, the Court expressed its view as follows: "Because the settlement limits the number of persons reinstated to four, it was my view that a safety-valve mechanism might be devised to assure that there would be no injustice to any individual because of the numbers limitation set forth in the settlement."

 *Monetary Relief.* The class will receive a total of $3.8 million.

The Supreme Court's decision in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), foreclosed retroactive application of certain provisions of the 1991 Civil Rights Act amendments, including the right to a jury trial and compensatory damages, to acts occurring before the effective date of the Act. Relying on *Landgraf*, the government took the position that prejudgment interest would not be available in this case. Accepting this position in consultation with their statistical experts, class counsel developed a projection of defendant's financial exposure on all damages issues in the range of $2.5 to $4 million. That estimate was based on its experts' detailed promotion back pay calculations and analyses of the stipulated database, and it represented counsels' assessment of the most likely outcome of successful litigation.

Relying on analyses performed by its statistical experts, the State Department vigorously disputed Plaintiffs' damage estimates and calculated that its maximum damage exposure ranged from $725,000 to $1.5 million.

Evaluation of an appropriate monetary settlement required the parties to assess the litigation risks attached to the class certification, the competing experts' statistical analyses, and a showing as to each challenged employment practice.

If litigation had continued, relief to the class would have been delayed for several years. In the event that a class would be certified on all issues, the parties then would have to complete a trial on the merits, a likely appeal by the losing party, and, then if successful, a follow-up individual "Teamsters hearings" on damages suffered by individual class members. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In the absence of a right to collect prejudgment interest, the Plaintiffs would need to recover a far greater monetary award in order to equal the amount to which the State Department ultimately agreed in settlement. In short, the Plaintiffs had to take into account the present value of money when comparing the State Department's final offer to the amount which could reasonably be recovered at the conclusion of protracted litigation. To justify continuing to litigate for five more years, class counsel projected that Plaintiffs would have to recover at least $5.6 million at that time to equal the present value of the $3.8 million settlement amount accepted by class counsel. The calculation of the time value of the $3.8 million monetary award projected over 3–5 years far exceeded Plaintiffs' most optimistic estimate of the likely monetary recovery on behalf of the class.

In light of those combined considerations, the Court does not dispute the statement that a $3.8 million monetary settlement was at the high end of projected litigation outcomes and represents a fair, adequate, and reasonable monetary award to the class.

As supported by the findings of fact in this case, the Court concludes that the classwide prospective and retroactive settlement terms constitute substantial relief which satisfies virtually all of the class's litigation objectives. Thus, protracted litigation is not likely to yield significant additional relief.

■■■■ In addition to balancing the likely outcome of litigation against the settlement terms and considering the context in which the settlement was reached, the Court must consider the reaction of the class to the proposed agreement. In this case, 55 out of 359 class members, or 15 percent of the class, oppose final approval of the Consent Decree. Court approval of a class action settlement does not hinge exclusively on a vote by class members. In fact, under well established case law, a fair, reasonable, and adequate settlement will obtain court approval notwithstanding a significant number of objectors. *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir.1987); *Isby v. Bayh*, 75 F.3d 1191 (7th Cir.1996) (approval over objections of 13% of 200 member class); *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir.1985) (approval over objections of 15% of 253 member class), *cert. denied*, 478 U.S. 1004, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986); *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir.1983) (approval over objections by 23 of 27 named Plaintiffs and 15% of 1,500 member class); *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456 (2d Cir. 1982) (settlement approved despite objections of holders of 56% of outstanding shares);

*Cotton v. Hinton,* 559 F.2d 1326 (5th Cir. 1977) (approval over objections of counsel claiming to represent almost 50% of class); *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974) (approval over objections of approximately 20% of 452 member class).

Further, class action settlement agreements do not require the assent of named Plaintiffs as a prerequisite to Court approval. *Flinn v. FMC Corp.,* 528 F.2d 1169, 1174 n. 19 (4th Cir.1975) ("Appellants do not argue, nor may they under the authorities, that assent of the class Plaintiffs is essential to the settlement, provided the trial court finds it fair and reasonable."); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1216 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979) ("To be sure, the assent of named Plaintiffs is not a prerequisite to court approval."); *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 855 F.Supp. 825 (E.D.N.C.1994) (approval over objections of majority of named Plaintiffs).

 Even faced with vociferous objection to a proposed settlement, the court has a fiduciary responsibility to protect the interests of silent class members. *Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 23 (2d Cir. 1987).

In this case, the vast majority of class members (85%) have not voiced any objection to the Consent Decree. That high percentage is certainly evidence that the settlement is not unfair or inadequate in the opinion of the class. Several objectors believed that one or two provisions of the settlement are unfair and asked the Court to disapprove the entire settlement on that basis or to direct counsel for the parties to revise the objectionable provisions.

Each of the issues raised by the objectors was carefully considered. Ultimately, however, in a class action, the best interests of the class as a whole must remain the paramount consideration even though some class members believe that they will not receive all the individual relief to which they believe they are entitled. After carefully considering the objections, the Court concludes that the Consent Decree as a whole is fair, reasonable, and adequate to the class. Accordingly, the Court will not deny final approval on the basis of those objections.

In addition to the specific factors which guide a court's review of a class action settlement, there is a strong public policy favoring settlement of litigation. The Supreme Court has emphasized the strong Congressional preference for encouraging voluntary settlements of Title VII actions. The Court has explained that "Congress enacted Title VII ... to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin ... cooperation and voluntary compliance were selected as the preferred means for achieving this goal." *Alexander v. Gardner–Denver,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). Other courts also have recognized the importance of this policy. *See, e.g., Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.) (approved settlement will not be upset unless court clearly abused its discretion; limited review rule is a product of the strong judicial policy favoring the resolution of disputes through settlement), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157 (5th Cir. 1978) (reconciliation and settlement are "preferred means for resolving employment discrimination disputes"), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *In Re Domestic Air Transp. Antitrust Litigation,* 148 F.R.D. 297 (N.D.Ga.1993) (in determining whether to approve class action settlement, the district court must be guided by strong judicial policy favoring settlement as well as the realization that compromise is the essence of settlement); *Hammon v. Barry,* 752 F.Supp. 1087, 1100 (D.D.C.1990) ("well settled that, particularly in class action suits, there is an overriding public interest in favor of settlement"); *Ellis v. Naval Air Rework Facility,* 87 F.R.D. 15, 18 (N.D.Cal.1980) ("cooperation and voluntary compliance are the preferred means for achieving the statutory goals of Title VII").

### Opting Out of the Settlement Agreement

█ Despite the many positive features of the proposed Consent Decree, the Court remains concerned by the number of dissenters. That concern relates to an issue that remains unresolved by the proposed Consent Decree, that of the right of class members to opt out of the proposed class settlement in order to retain the option to bring an individual lawsuit under Title VII. The Court concludes that allowing for "opting out" in this case would be the course of action most consistent with the purposes of the statute, and hereby grants those sixteen members of the class who have indicated the desire to opt out of this class settlement the right to do so.

But the Court will also allow those sixteen members additional time, until November 30, 1996, to reconsider their decision to opt out, and to rejoin the class settlement. After November 30, 1996, however, any of the sixteen members who have not rejoined the class settlement can only gain relief by fully complying with all procedural requirements of Title VII and, if so satisfying those requirements, by bringing their own, separate, individual actions under Title VII.[2] They will receive no monetary benefits from the settlement.

Allowing for "opting out" is consistent with case law and the best interests of justice. It is clear that the Court has the authority to take this action. The authority of a court to approve a Consent Decree in this or any action brought under Title VII is derived from the statute itself and not the consent of the parties. *See Firefighters Local No. 1784 v. Stotts et al.,* 467 U.S. 561, 576, 104 S.Ct. 2576, 2586, 81 L.Ed.2d 483 (1984). The court may modify any such decree to serve the purpose of the statute. *Turner v. Orr,* 759 F.2d 817, 825 (11th Cir.1985). Particularly is this so in this case, where the parties have specifically presented the issue to the Court for resolution.

In *Pettway v. American Cast Iron Pipe Company,* 576 F.2d 1157 (5th Cir.1978), the parties presented a consent decree for approval to the district court which arose from a settlement negotiated by the parties. The district court made substantial modifications to that consent decree and the court concluded that it must be certain that a settlement "does not unfairly impinge on the rights and interests of dissenters." *Id.* at 1214. In *Reynolds v. King,* 790 F.Supp. 1101, 1107 (M.D.Ala.1990), the court rejected a settlement agreement in a class action challenging the Alabama Highway Department's alleged employment discrimination and warned that a court must be careful to scrutinize whether, under a proposed settlement, the interests of certain class members are sold out.

But the most relevant precedent is *Holmes v. Continental Can Co.,* 706 F.2d 1144 (11th Cir.1983). In that case, the circuit court held that a district court had abused its discretion by failing to allow opt out from a 23(b)(2) class that was facially unfair. In the decision, the court extensively discussed the applicability of opting out in a (b)(2) class action and concluded that when the damages stage of such actions take on the appearance of a (b)(3) action, a district court has discretionary power under rule 23(d) to allow "opt out" and design the procedures for such an action. *Id.* at 1153–56. It is appropriate to allow for "opt out" when the monetary relief stage of a particular Title VII lawsuit is functionally more similar to a (b)(3) class than to a (b)(2) class.

Here, Defendant argues that "opt out" should not be authorized in this (or, presumably, any) Rule 23(b)(2) class settlement. Defendant points to the long-standing concern that future defendants would not be inclined to settle where the result would likely be a settlement applicable only to class members with questionable claims, and argues that the government did not bargain for a spate of individual claims following settlement.

However, the facts of this matter do not give weight to Defendant's theoretical concerns. Only 16 members have chosen to opt out of the settlement class. Some number of those opt outs may yet choose to opt back in

---

**2.** The Court understands that three members of the plaintiff class who had previously asked to "opt out" of the proposed settlement have now asked to rejoin the settling class. The Court hereby grants their request.

to the class before November 30, 1996, as this Court has decreed; others, likely, may never bring or never be able to support an individual Title VII action. The Court has no reason to conclude with Defendant that those members of the class who would "opt out" are, in fact, those members with the strongest Title VII claims. What is more, if Defendant is right and those who want to opt out do have the strongest cases, what a grave injustice would then be done to those parties if this Court were to extinguish their individual rights.

The Court has been impressed with the vehemence with which some members of the class have opposed the settlement. It is quite clear that those members will believe themselves to have been "sold out" if this Court refuses to allow opt out of the settlement.

At the heart of this issue is the question of what distinguishes a (b)(2) class from a (b)(3) class. "At base, the (b)(2) class is distinguished from the (b)(3) class by class cohesiveness ... Injures remedied through (b)(2) actions are really group, as opposed to individual injuries." 706 F.2d at 1154. The concern of this Court is that, in the absence of allowing for "opting out" some searing individual injury might be greatly under compensated. It would be terribly unfair to any African–American who may have been denied the opportunity to serve his country at the highest level of the diplomatic corps as a result of employment discrimination to be denied the opportunity to prove his or her individual claim. Justice demands that a defendant not be permitted to paper over any such injury if, in fact, it has occurred.

### CONCLUSIONS

The Court wishes to congratulate the parties for performing admirably in resolving a complex and difficult matter. Counsel representing both Plaintiffs and the Defendant have performed in an exemplary fashion. In particular, the Court wishes to single out Magistrate Judge Alan Kay, who mediated the controversy, for his superb efforts. All participants who have worked so hard to resolve this matter should be proud of this settlement. The settlement, in conjunction with allowing for "opting out" by those who elect to do so, provides an excellent framework for correcting and redressing employment discrimination at the Department of State.

That having been said, the Court does repeat its request that the Secretary of State voluntarily establish some process for looking at the 15 or so African–Americans who still seek reinstatement or some other action with respect to their individual cases. It is surely not in keeping with the spirit of the settlement and the expressed desires of a concerned Administration to deny reinstatement or some other form of action simply because of the admittedly arbitrary limitations of the settlement agreement. While the Court understands that there is some possibility that others within the Department might question the establishment of an ad hoc process, the ability to do so should not be insurmountable.

\* \* \* \* \* \*

The Court hereby finds the Consent Decree to be fair, reasonable and adequate under the circumstances. Further, with respect to the issue presented by the parties as to whether certain members of the class may "opt out" of the settlement, the decision of this Court is to grant them the right to do so. An appropriate order is attached hereto.

### *ORDER*

Plaintiffs' case was originally brought in October 1986. On January 31, 1996, counsel for the plaintiff class agreed to recommend a settlement to the approximately 360 putative class members. The terms of the settlement are embodied in a Consent Decree, which was signed by the parties on January 31, 1996, and then submitted to the Court for its approval. The Court held a preliminary hearing on the Consent Decree on March 13, 1996 and after hearing counsel and certain proponents and objectors granted preliminary approval of the Consent Decree on March 22, 1996. The Consent Decree and a court-approved notice, informing members of the class of their rights with respect to the Consent Decree, was then sent to all known members of the class. The Court subsequently held Fairness Hearings on July 15, 1996, July 22, 1996 and July 23, 1996 and had an additional hearing on September 19, 1996.

Upon consideration of the Consent Decree, the relief awarded therein, and all objections presented by affected class members, and for the reasons stated in the attached Memorandum Opinion, the Court hereby finds the Consent Decree to be fair, reasonable and adequate under the circumstances. By approving the Consent Decree, the Court hereby certifies a class of all African–Americans who are or were State Department Foreign Service Generalist Officers or Foreign Service Generalist Officer career candidates at any time between January 20, 1984 and March 22, 1996, the date of Preliminary Approval of the Consent Decree.

The Court also finds that allowing for "opting out" by those sixteen members of the settlement class who still choose to do so is consistent with the best interests of justice. The Court allows those sixteen members additional time, until November 30, 1996, to reconsider their decision to opt out, and to rejoin the class settlement. Their failure to do so shall preclude them from participating in or receiving any of the monetary benefits provided for by the settlement agreement.

The three members of the plaintiff class who had previously asked to "opt out" of the proposed settlement and have now asked to rejoin will be allowed to do so and it is so ordered; and it is further **ORDERED** that the Consent Decree be **APPROVED**, with the exceptions noted.